FILED

JUL ? 1 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY  /s/  DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| TERESA E. NEATHERY,<br><br>                    Plaintiff,<br>vs.<br><br>CHEVRON TEXACO CORPORATION GROUP ACCIDENT POLICY NO. OK 826458 et al.,<br><br>                    Defendants. | CASE NO. 05 CV 1883 JM (CAB)<br><br>**MEMORANDUM AND DECISION AFFIRMING DEFENDANTS' DECISION TO DENY BENEFITS** |
|---|---|

Plaintiff has brought this action to recover accidental life insurance proceeds under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiff brings this action pursuant to 29 U.S.C. § 1132(a)(1)(B) claiming that these benefits were unlawfully denied. Defendants are Voluntary Group Accident Insurance Plan and On-the Job Accident Insurance Plan, erroneously sued as Chevron Texaco Corporation Group Accident Policy No. OK 826458 and Accident Policy No. SLG-000784 (collectively "Defendants" or "the Plans"). Life Insurance Company of North America ("LINA") is the administrator of the Plans. The issue before the court is whether or not Defendants abused their discretion in denying benefits. A bench trial was held on June 13, 2007, at which the court ordered supplemental briefing on the issue of whether the court may conduct de novo review

of the record when the plan administrator is operating under a conflict of interest, even though the plan administrator has discretion under the plan.[1] That supplemental briefing was submitted by June 22, 2007. After reviewing the administrative record, the parties' trial and supplemental briefs, and the oral arguments of counsel, the court rules that Defendants did not abuse their discretion in denying benefits to Plaintiff.

**CIRCUMSTANCES SURROUNDING NEATHERY'S DEATH**

On May 18, 2004 in Bakersfield, California, Plaintiff's husband, Robert N. Neathery ("Neathery"), an employee of Chevron Texaco, was eating a company-sponsored lunch. After completing his meal, Neathery got into his company-furnished truck and began driving on China Grade Loop. Neathery's co-worker, Ede Pacaldo, was driving behind Neathery in a separate company-furnished truck. Both Neathery's truck and Pacaldo's truck were moving at approximately 10 miles per hour along China Grade Loop when Pacaldo observed Neathery's truck drift off to the side of the road and hit an oil pump located on Chevron Texaco private property. AR 470, 492, 860-61, 867.[2] It was Pacaldo's further observation, as stated in her deposition, that Neathery's truck had drifted off at a constant speed, neither speeding up nor slowing down as it left the road and approached the oil pump. AR 877. The truck partially rode up the well's A-frame and as a result, rolled over onto its passenger side. AR 336, 490, 491, 867. Both airbags deployed. AR 493. The fact that Neathery's truck had begun pulling to the side of the road did not initially strike Pacaldo as unusual because employees often pull over to examine wells lining the road. AR 865.

Pacaldo pulled over to investigate the scene. As Pacaldo grabbed her cell phone to call for help, the phone began ringing with a call from another co-worker. Pacaldo answered the call and told the co-worker that there had been an accident and directed

---

[1] The court has already ruled that it will review Defendants' decision to deny benefits for abuse of discretion. The court has also ruled that the scope of review will be limited to the record before Defendants during administrative proceedings.

[2] All references to "AR" pertain to Defendants' "Notice of Submission of Administrative Record and Other Documents."

the co-worker to call 911. AR 868. Pacaldo then ran over to Neathery's truck and started screaming at Neathery, pounding at him through the front windshield. AR 869. Neathery was unresponsive. AR 870. Pacaldo observed that Neathery's face was limp, that his eyes were open, that his mouth was open, and that his arms were twitching. AR 870-71. Seconds later, another operator arrived on the scene by truck. AR 871-72. Pacaldo grabbed a tool from the operator's truck and broke through the back window of Neathery's truck. AR 870. Pacaldo attempted to find Neathery's pulse but discovered none. AR 870. Pacaldo did not notice any signs of injury to Neathery, such as blood, bruising, or redness. AR 878. As Pacaldo was holding Neathery in search of a pulse, Neathery began vomiting. AR 873. Pacaldo did not observe the presence of vomit in Neathery's truck before Neathery began vomiting in her arms. AR 874. Neathery was still strapped into his seat beat at the time. AR 873.

The California Highway Patrol ("CHP") arrived on the scene and issued a traffic collision report indicating that the collision had occurred at 12:25 PM. AR 486. The CHP report further provided that "[i]t appeared Neathery experienced a medical emergency . . . [t]his was suspected, in part, by the fact Neathery had regurgitated inside vehicle #1 and the absence of any obvious injury." AR 492. The report went on to conclude that "Neathery experienced an apparent medical emergency. Due to Neathery's physical impairment, vehicle #1 drifted to the left." AR 492.

Paramedics also arrived on the scene. The paramedics report concludes that Neathery died from a cardiac arrest, AR 472, in part because Neathery was found to have experienced cyanosis. AR 470.[3]

The Kern County Coroner concluded that the cause of death was asphyxia due to aspiration of gastric contents, and that the manner "[a]fter completing an investigation in conjunction with the California Highway Patrol, the death of Robert Monroe Neathery was found to be an accidental death." AR 477. The coroner went

---

[3] According to the coroner who conducted the decedent's autopsy, cyanosis "refers to the blue discoloration you get with unoxygenated or poorly oxygenated blood." AR 812-13.

- 3 -

on to indicate that, according to Plaintiff, Neathery had suffered from indigestion or heartburn on the Sunday before the accident, and that Plaintiff "also stated that her husband would sometimes have to vomit while in the car and could not wait and just pull over on the roadway. This did not happen often." AR 477. Finally, after noting that Neathery had been diagnosed in the past with a hiatal hernia and broke his right hand in 2003, the coroner noted that a check with Kaiser Permanente Medical Records showed that Neathery had no other medical history. AR 477.

Dr. Dollinger, a forensic pathologist, conducted the autopsy on Neathery. With respect to Neathery's cardiovascular system, Dr. Dollinger noted that

> Left coronary dominance with no significant narrowing of the left main artery, less than 10% atheromatous narrowing of the left anterior descending branch, no significant narrowing of the left circumflex branch and no significant narrowing in the 1.5 mm diameter of the right coronary artery.
>
> . . .
>
> The pericardial surfaces are smooth and exhibit no abnormal fluid collections. The heart has the usual external configuration without dilatation. The myocardium is unremarkable. The valves exhibit no abnormalities. The coronary arteries are unremarkable. The aorta has the usual configuration and appearance. The great vessels, including pulmonary arteries, superior and inferior vena cavae are unremarkable as are the peripheral vessels.

AR 482. Dr. Dollinger noted in Neathery "[m]arked to very marked cyanosis of the head, neck and shoulders" as well as "[m]oderate cyanosis of the nail beds of the right hand." AR 481. Dr. Dollinger further found that Neathery's lungs were "filled with gastric contents extending well into the bronchial tree and into the periphery of the lower lobe of the right lung." AR 482. Dr. Dollinger concluded that "[t]he significant negative findings disclose: a. No evident natural disease accounting for or contributing to death. b. No evidence of trauma." AR 484. Dr. Dollinger concluded that the death was accidental and caused by asphyxia due to aspiration of gastric contents. AR 480. Later, in his deposition, Dr. Dollinger testified that there was no circumstantial evidence that the decedent had died from a cardiac event, but that it was possible

because [the] decedent did have some coronary artery disease but nothing that would indicate the likelihood of a cardiac event . . . the coronary disease present was minimal. I can't exclude the possibility of a cardiac event because it can happen. Cardiac event occurs in people without any apparent cardiac disease, but it's not usual. Usually if they have coronary artery disease, there would be sufficient narrowing of the vessel to account for sudden cardiac event, and I did not see anything that would support that.

AR 50.

Finally, Neathery's death certificate indicated the cause of death was asphyxia through aspiration of gastric contents. AR 473.

## PLAINTIFF APPLIES FOR BENEFITS

Neathery, as a Chevron Texaco employee, held a "Voluntary Accident Group Insurance" plan (the "VGAI plan") and an "On-the-job Accidence Insurance" plan (the "OJA plan"). The Plans were funded through an insurance policy purchased by Chevron Texaco from LINA. As admitted by Defendants at trial, LINA is both the administrator of the Plans and the Plans' funding source. Each of the Plans require any death on which a claim is submitted to be accidental and not caused by disease or illness. Specifically, the VGAI policy language provides:

> Covered Accident – A sudden, unforeseeable external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions: . . . 2. is not contributed to by disease, Sickness, mental or bodily infirmity; 3. is not otherwise excluded under the terms of this policy.
>
> Covered Injury – Any bodily harm that result directly and independently of all other causes from a Covered Accident.
>
> COMMON EXCLUSIONS
>
> In addition to any benefit-specific exclusions, benefits will not be paid for any covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from any of the following . . . (5) sickness, disease, bodily or mental infirmity, diagnosis or treatment thereof[.]

AR 315, 321. The OJA plan in turn provides:

> "On-the-Job Accident" means an accident . . . that is caused directly and independently by external, violent and purely accidental means.
>
> We agree to pay for a loss from bodily injuries;
> a) caused by an accident which happens while an Insured is covered by this

> policy; and b) which, directly and from no other causes, result in a covered loss. (See the Description of Coverage.)
>
> We will not pay benefits if the loss was caused by:
> a) sickness, disease or bodily infirmity; or b) any of the Exclusions listed.
>
> EXCLUSIONS
> Benefits shall not be paid for loss caused by or resulting from: . . . c) Physical or mental illness or disease, or diagnosis or treatment of illness or disease[.]"

AR 296, 298, 304. Neathery was an employee of Chevron Texaco and a participant in the two accidental death plans and thus eligible for benefits of $200,000 under the VGAI policy and $500,000 under the OJA policy. Plaintiff was the named beneficiary of both plans.

In June 2004, Plaintiff submitted claims to Defendants for accidental death insurance proceeds pursuant to the VGAI and OJA policies. AR 289. On September 13, 2004, Defendants denied benefits on the ground that a medical crisis, not an accident, had caused her husband's death. AR 229. Specifically, Defendants concluded that Neathery had died from a pre-existing medical condition that caused him to inhale his own vomit and thereby asphyxiate. In making its decision, Defendants relied on (1) the VGAI and OJA policies, (2) Neathery's death certificate, (3) Plaintiff's claim form, (4) the CHP traffic collision report, and (5) the completed coroner's report including toxicology results. AR 230. Among other things, Defendants noted Plaintiff's statements, as documented in the CHP report, that Neathery took over the counter antacids and that Neathery had indigestion or heartburn the Sunday before the accident and that it had subsided. Cigna further noted Plaintiff's statements, as documented in the CHP report, that Neathery would sometimes, but not very often, have to vomit while in the car and could not wait until pulling over on the roadway. AR 231. According to Defendants, the lack of trauma or injury, as well as heightened levels of carbon monoxide from toxicology results consistent with hypoxia, further supported the conclusion that Neathery had died due to a medical event and not from an accidental collision with the oil pump. See AR 231.

## ADMINISTRATIVE APPEAL

Plaintiff then retained an attorney and sought to appeal the adverse benefit determination. After being granted numerous extensions of time by LINA to perfect her appeal, Plaintiff mailed her appeal on May 19, 2005, which was received by LINA on May 20, 2005. A copy of Plaintiff's appeal, which is voluminous, taking up one full five-inch, three-ring binder and containing what appears to be hundreds of pages of documents, has been submitted to the court. Pl. Second Not. of Lodgment. In her appeal documents, Plaintiff asserted that the evidence showed Neathery's death was due not to a medical event, but rather Neathery had purposefully pulled off the road to inspect an oil well, misjudged the distance to the oil well, and accidentally crashed into it. Plaintiff further contended that when the truck's airbags deployed, the pressure exerted on Neathery's body caused Neathery to vomit and in turn aspirate the vomit into his lungs, thereby causing his death. In support of these assertions, Plaintiff submitted, among other things, the reports of Dr. Kochenderfer, an anesthesiologist, Dr. Simon, a trauma surgeon, and Thomas Feiereisen, an accident reconstructionist.

Dr. Kochenderfer, after expounding on medical principles related to airway anatomy and reflexes, opined that:

> Mr. Neathery had a vehicle accident resulting in a loss of consciousness with an associated loss of protective airway reflexes. He regurgitated stomach contents from a full stomach, aspirated these stomach contents into his airways, thus blocking intake of air, and suffered anoxia (loss of oxygenation), asphyxia (suffocation) and death within minutes.

Pl. Second Not. of Lodgment, Kochenderfer Report at 4.

Dr. Simon reviewed Neathery's medical history and concluded that "[m]edical chronological history reveals only minor benign common afflictions most resolved with medical therapy." Id., Simon Report at 1. Citing the presence of "parallel pressure marks across the epigastria", Dr. Simon concluded that Neathery "died from a traumatic event secondary to a motor vehicle crash" due to the pressure from the deployed airbags causing a "Heimlich maneuver" phenomenon on Neathery, resulting in aspiration of gastric contents. Id., Simon

- 7 -

Report at 2-3.

Thomas Feiereisen, Plaintiff's accident reconstructionist, reviewed the CHP traffic collision report, photographs of the scene and truck, the coroner's report, correspondence between Defendants and Plaintiff, and transcripts from the depositions of Ede Pacaldo, Officer Mark McGary,[4] and Plaintiff. Feiereisen observed that "[t]he color of the pump structure is similar to the surrounding ground providing poor visual contrast between pump structure and the ground, particularly at the base."[5] Based on the amount of damage to Neathery's truck, Feiereisen estimated that the truck was traveling at 17 to 25 miles per hour upon impact. Id., Feiereisen Report at 3. Feiereisen went on to conclude that force of the crash resulted in the seatbelt exerting 900 to 1600 pounds of pressure on Neathery's abdomen and that the airbag exerted 1500 to 2300 pounds of pressure on Neathery's torso. Id. at 5.

LINA received Plaintiff's appeal on May 20, 2005. Under applicable regulations, LINA had no later than sixty days after receiving Plaintiff's request for review to render its decision with a permissible extension of this period of no more than sixty additional days if special circumstances required. 29 C.F.R. § 2560.503-1(I)(1). Therefore, LINA's deadline for responding was no later than September 20, 2005. LINA did not respond by this date.

**THE INSTANT LITIGATION**

On September 30, 2005, and before LINA decided the appeal, Plaintiff filed this lawsuit. LINA then proceeded to both litigate this lawsuit and process Plaintiff's appeal at the same time.

On December 19, 2005, in connection with the appeal and after Plaintiff filed suit, Defendants provided to Plaintiff the report of forensic pathologist Dr. James

---

[4]McGary was the CHP officer who prepared the traffic collision report. AR 486.

[5]This observation carries little if any weight, however, in light of Feiereisen not having visited the accident scene itself. The alleged poor contrast in the photograph could be just as much due to defects in the processing of the photograph as much as actual poor contrast at the scene.

Lewis (the "Lewis Report"), who opined that Neathery's death was caused by an acute myocardial event. LINA indicated to Plaintiff that it would rely on the Lewis Report in deciding the appeal, and asked Plaintiff to submit written comments thereto which LINA would then incorporate into the administrative record. See Docket No. 63 at p. 2 (Court's order denying Plaintiff's motion to supplement the administrative record). In a December 29, 2005 response letter, Plaintiff declined to submit comments, contending that because Plaintiff had exhausted her administrative remedies, the administrative record was therefore closed and Defendants had no right to continue with the appeal. Id.[6] In the same letter, Plaintiff "reserved her right" to comment on the Lewis Report at a later time, and have those comments incorporated into the administrative record, should the court decide to consider the Lewis Report. Id.

On December 20, 2005, Plaintiff moved for partial summary judgment on the issue of whether Plaintiff had exhausted her administrative remedies, thereby entitling her to judicial review. See Docket No. 10; Diaz v. United Agr. Employee Welfare Ben. Plan and Trust, 50 F.3d 1478, 1483 (9th Cir. 1995) (holding that ERISA claimants must first exhaust their administrative remedies before bringing suit in federal court); 29 C.F.R. § 2560.503-1(*l*) ("In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act[.]"). While the motion was being briefed, LINA, in a January 12, 2006 letter, again invited Plaintiff to submit written comments on the Lewis Report:

> Ninth Circuit case law holds that the Administrative Record closes once LINA issues it [sic] final decision on appeal, irrespective of whether your client has been deemed to have exhausted her administrative remedies. However, even if this were not the case your client is not harmed by commenting on Dr. Lewis' report, as she can always argue to the Court at a later date the reasons why she believes the report should not be given any merit . . .

---

[6] As of December 29, 2005, however, the court had not yet ruled that Plaintiff had exhausted her administrative remedies.

> Accordingly, I urge you to notify me immediately if you and/or your experts would like to comment on Dr. Lewis' report. If I do not hear from you, as to your intention in this regard within the next 10 days, LINA will proceed to close the Administrative Record and issue a final decision on your client's appeal without additional comment from her.

See Docket No. 87 (Bernacchi Decl. in Support of Motion to Strike, Ex. 14 at 77-78). Plaintiff declined this second invitation to comment, again purporting to reserve her right to comment later. Docket No. 95, Ex. 2. Defendants continued to process the appeal.

In a January 27, 2006 letter, LINA issued its final decision on appeal, denying Plaintiff benefits on the ground that, based in part on the Lewis Report, Neathery had died from an acute myocardial event, or heart attack,[7] and therefore benefits were not due under the policies' terms. AR 45. Specifically, Dr. Lewis had reviewed the record, including Plaintiff's medical history, AR 10-11, 17-18, and concluded that the cause of death was a preexisting medical condition. In support of his conclusion, Lewis cited the decedent's medical records which indicated a history of myocardial arrhythmia, hypercholestermia, hypertriglycemia, significant medical family history of heart disease, that the decedent had a significant history of "gastric pathology including gastric ulcers, hiatal hernia and gastroesophageal reflux disease (GERD). In our opinion resulting in an increased potential for vomiting/aspirating during an acute myocardial event." AR 25. Dr. Lewis also found the fact that the death occurred shortly after eating significant because "many decedents who suffer fatal myocardial events happen shortly after eating or strenuous activity." AR 25. After running through various possible scenarios, Lewis concluded that "Mr. Neathery's death was due to an acute myocardial event (myocardial infarction and/or fatal cardiac arrhythmia). Evidence of aspiration of gastric contents is consistent given his past medical history and associated with these types of deaths." AR 27.

---

[7] This is to be contrasted with the reason given for the initial denial of benefits, which was that Neathery had died from aspiration of gastric contents.

LINA's January 27, 2006 letter also addressed the three expert reports submitted by Plaintiff–those of Dr. Kochenderfer, of Dr. Simon, and of Thomas Feiereisen–and provided reasons why each of those reports lacked merit. In support of its conclusion that Neathery had died from a myocardial event which led to him to drift off the road and crash into the oil pump, LINA's letter provided:

> A review of Robert Neathery's medical records submitted by your office reveals that he experienced a range of illnesses and injuries over the prior 10+ years of his life. Many of the noted problems were typical, non-life threatening and were controlled or corrected by treatment. However, it is notable that Mr. Neathery had a history of significant irregular heart rhythm, although he was not known to have previously been restricted in his ability to perform physical tasks. In 2003, Mr. Neathery was also noted to have been diagnosed with occasional premature ventricular complexes, possible premature atrial complexes with aberrant conduction defect.

AR 51-52. LINA further noted Lewis's opinion that the original noted cause of death, asphyxiation through aspiration of gastric contents, may have been a contributing cause of death because many victims who suffer a fatal myocardial event vomit prior to death and some aspirate. AR 52. Dr. Lewis had also opined that death due solely to aspiration of gastric contents rarely occurs instantaneously, and that the death here was instantaneous because Pacaldo had testified that she saw Neathery's frozen and unresponsive facial expression shortly after the crash. AR 52, 870-71.

On February 14, 2006, the court granted Plaintiff's motion for partial summary judgment, concluding that Plaintiff had exhausted her administrative remedies for purposes of seeking relief in federal court. See Docket No. 33.

On May 8, 2006, Plaintiff moved for partial summary judgment on the standard of review applicable to Defendants' denial of benefits. On July 31, 2006, the court ruled that the applicable standard was abuse of discretion.

On January 11, 2007, Plaintiff moved to supplement the administrative record on review with additional evidence not before LINA during the underlying administrative proceedings. This evidence was offered to attack the credibility of the Lewis Report, evidence which LINA had twice solicited from Plaintiff for incorporation into the administrative record before the final decision on appeal would

be made. As stated earlier, Plaintiff declined both opportunities to comment on the Lewis Report before the appeal was decided. On April 11, 2007, the court denied the motion and held that its abuse-of-discretion review would be limited to the administrative record before LINA at the time. <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 970 (9th Cir. 2006) (en banc) (noting rule that when the abuse of discretion standard applies, the scope of review is limited to the administrative record before the plan administrator and the court may not consider extrinsic evidence).

Against this factual and procedural background, the court must now decide whether or not LINA, in light of all the evidence in the administrative record, abused its discretion in denying Plaintiff insurance proceeds on the ground that Neathery had died due to a medical event and not an accident.

## ANALYSIS

### Applicable Standard of Review

In connection with Plaintiff's motion for summary judgment on the standard of review when a plan administrator fails to render a timely decision on appeal, the court ruled that the applicable standard was abuse of discretion. Docket No. 63. At the bench trial, however, the new issue was raised of whether the abuse of discretion standard would still apply, or whether it would convert to <u>de novo</u> review, when the plan administrator who has discretion to interpret plan documents operates under an inherent conflict of interest. As already mentioned, LINA is operating under such a conflict because it is both the plan administrator and its source of funds. <u>Abatie</u>, 458 F.3d at 967.

After reviewing the supplemental briefs submitted by the parties on this issue, the court is confident that the standard of review remains abuse of discretion, to which LINA's conflict of interest will be relevant to the analysis. This is because <u>Abatie</u> expressly provides that the presence of a conflict of interest is one factor to be weighed in determining whether the plan administrator abused its discretion. <u>Id.</u> at 968. The more the conflict is accompanied by evidence of, for example, malice, self-dealing, or parsimonious claims-granting history, the more skeptical and stringent the court's

abuse-of-discretion review. Id. The court will take a flexible approach, weighing the conflict more or less depending on the circumstances. Id. at 968-69. Therefore, by definition, the court cannot rely on a conflict of interest to convert the standard of review to pure de novo, although the court's level of skepticism may result in something fairly close in the appropriate case. Other district courts applying Abatie have followed this approach. See, e.g., Daic v. Metropolitan Life Ins. Co., 458 F. Supp. 2d 1167, 1174 (D. Haw. 2006); Tuttle v. Standard Ins. Co., 459 F. Supp. 2d 1063, 1066-67 (W.D. Wash. 2006); Hawthorne v. Zurich American Ins. Co., 2007 U.S. Dist. LEXIS 44385, *22 (W.D. Wash. June 18, 2007).

One example of when a plan administrator abuses its discretion is when the administrator denies benefits without explanation or construes the plan in a manner that contradicts the plan's plain language. Taft v. Equitable Life Ins. Co., 9 F.3d 1469, 1472 (9th Cir. 1998) (citing Eley v. Boeing Co., 945 F.2d 276, 279 (9th Cir. 1991); Johnson v. Trustees of W. Conference of Teamsters Pension Trust Fund, 879 F.2d 651, 654 (9th Cir. 1989); Hancock v. Montgomery Ward Long Term Disability Trust, 787 F.2d 1302, 1307 (9th Cir. 1986)). A plan administrator "also abuses its discretion if it relies on clearly erroneous findings of fact in making benefit determinations", Taft, 9 F.3d at 1473, or if its decision is arbitrary and lacks a factual basis. Oster v. Barco of Cal. Employees' Retirement Plan, 869 F.2d 1215, 1218 (9th Cir. 1988). Under the abuse of discretion standard in the ERISA context, "even decisions directly contrary to evidence in the record do not necessarily amount to an abuse of discretion." Taft, 9 F.3d at 1473. Rather, a denial will be upheld under this standard so long as it is grounded in any reasonable basis. Horan v. Kaiser Steel Retirement Plan, 947 F.2d 1412, 1417 (9th Cir. 1991). One district court, however, has found that it is an abuse of discretion to rely solely on evidence favorable to the plan administrator while ignoring unfavorable evidence provided by the plan administrator's own experts. Hawthorne, 2007 U.S. Dist. LEXIS 44385 at *37 (finding that administrator abused its discretion when it "ignored the clear warnings of both its own experts and those of plaintiff's qualified expert in reaching a conclusion that was unsupported by the facts

on the record.").

### Defendants' Exercise of Discretion

As discussed above, as a general rule, when the abuse of discretion standard applies, the administrator's decision will be upheld as long as it has a reasonable basis in fact, i.e. it is not arbitrary and capricious. Abatie provides additional precepts. Under Abatie, in addition to any conflict of interest, the court must weigh any procedural irregularity which may have taken place during administrative proceedings in deciding whether the plan administrator abused its discretion. Abatie, 458 F.3d at 972. "When an administrator can show that it has engaged in an on-going, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." Id. (internal quotations omitted).

Plaintiff argues that Defendants' final decision on appeal had no reasonable basis in fact because Plaintiffs' experts provide a more plausible explanation for why Neathery died, namely, that Neathery misjudged the distance to the oil pump and crashed. This is not enough, however, to show that Defendants abused their discretion. Rather, Plaintiff must show that Defendants' decision was unreasonable. Taft, 9 F.3d at 1473; Horan, 947 F.2d at 1417.

After review of the entire administrative record, with heightened scrutiny, and mindful of Plaintiff's reasonable contentions relating to Neathery's cause of death, the court concludes that Defendants acted reasonably in denying the benefits to which Plaintiff claims entitlement. In their final decision, Defendants addressed each of Plaintiff's expert reports and stated why they were not credible in light of the evidence. Defendants submitted Neathery's medical records to Dr. Lewis[8] for review, which

---

[8]Plaintiff alleges that Defendants did not verify Dr. Lewis's qualifications before retaining him as an expert and that Dr. Lewis is essentially a "hack" expert. However, there is nothing in the record to support this allegation. Plaintiff earlier submitted evidence it contended showed that Dr. Lewis is unqualified, but that evidence was not made part of the record. Plaintiff, as part of its reply to the instant motions, submitted Lewis's curriculum vitae as well as Lewis's opinion rendered in another case against Defendants. This other opinion is proffered to attack Lewis's credibility, see Pl.

demonstrated a good faith investigation in light of the fact that benefits were ultimately denied on the basis of a preexisting medical condition. Although the autopsy revealed some, but not substantial, evidence of coronary heart disease in the decedent, see AR 50, Lewis reasonably concluded to the contrary on the basis of the decedent's medical records. AR 17-18. In sum, Defendants' decision has a reasonable basis in the record. The court makes this finding fully aware of Plaintiff's forceful argument that Defendants abused their discretion by first concluding that Neathery died from aspiration of gastric contents and then, on appeal, concluding that Neathery died from a myocardial event. Indeed, the fact that Defendants tacked on a new reason for denial on appeal itself warrants the court's suspicion. Abatie, 458 F.3d at 974. In mitigation, however, Defendants engaged in a good-faith, ongoing dialogue with Plaintiff during the appeal process and gave Plaintiff notice that it would rely on this new reason and an opportunity to be heard. Id. at 972 (providing that when the administrator shows that it has engaged in an ongoing, good faith exchange of information, the administrator's decision is entitled to broad deference notwithstanding a minor irregularity). Moreover, Defendants' reliance upon Dr. Lewis's opinion, which did not address the opinion of Dr. Dollinger that Neathery exhibited essentially normal cardiovascular health, is of concern. Cf. Hawthorne, 2007 U.S. Dist. LEXIS 44385, *27-28 (finding abuse of discretion when plan administrator "failed to acknowledge and investigate critical conclusions of both its own experts and plaintiff's reliable experts."). This concern is somewhat mitigated by the fact that Dr. Dollinger was not able to rule out the possibility of a cardiac event and did note some evidence of coronary heart disease upon viewing the body.

After careful review, through heightened scrutiny, the court concludes the medical evidence submitted by Defendants supports a reasonable inference that an acute myocardial event caused or contributed to Neathery's death. This conclusion is

---

Request for Judicial Notice at 2, but Plaintiff provides no reason as to why it is relevant. Dr. Lewis's opinion in another case has no material bearing on this case. The purpose for which it is offered is attenuated from the issues in this case. Accordingly, Plaintiff's request for judicial notice is denied.

strongly buttressed by the manner in which Neathery operated his truck immediately before it made contact with the oil pump. The testimony of witness and co-worker Pacaldo, when considered with other undisputed evidence, presents a rather clear picture of Neathery's truck "drifting" from the road, over a curb, and down a gradual grade at an increasing speed until it contacted the pump structure with no indication of Neathery slowing or braking. In the few seconds it took for Pacaldo to reach Neathery's vehicle, his eyes and mouth were already open and fixed. In sum, this non-medical evidence is highly relevant and strongly suggestive that Neathery suffered an acute medical (non-accidental) event which caused, or contributed to, Neathery's inability to control his vehicle before it made contact with the oil pump.

When the manner in which Neathery's truck left the road and contacted the oil pump is combined with Pacaldo's observations of Neathery, the opinion of Dr. Lewis is strengthened in such a way that the court's residual concerns, earlier expressed, are allayed.

Addressing Plaintiff's remaining contentions, Plaintiff next argues that Defendants "prepared no chronology or detailed description or assessment of Decedent's past 13-year medical history, detailed or otherwise." Pl. Opening Brief at 7. Plaintiff further contends that when processing the appeal, Defendants "neither investigated nor obtained any new accident reports or documents, new photographs, site information, interview facts, medical records, but simply presented its alternative hired 'argument' through Dr. Lewis." Id. at 8. The record shows, however, that Dr. Lewis considered the decedent's medical history documents in connection with his report, documents which were not considered when Defendants first denied Plaintiff's claim. Compare AR 230 with AR 10-11, 17-18. The final decision gave full consideration to witness deposition testimony and other evidence submitted by Plaintiff as part of her appeal. See, e.g., AR 49. The record shows that Defendants gave fair and full consideration to the evidence, both the evidence submitted by Plaintiff (additional expert reports, witness depositions) and evidence affirmatively gathered by Defendants (e.g. decedent's medical records for Dr. Lewis's review).

    Plaintiff also claims that Defendants should have consulted more experts instead of relying solely on the opinion of Dr. Lewis. Pl. Opening Brief at 7. However, Plaintiff fails to provide any reason or authority why using the report of Dr. Lewis only, a forensic pathologist, was an abuse of discretion.

    Finally, Plaintiff argues that Defendants abused their discretion in failing to obtain sufficient evidence when the claim was first denied. Pl. Opening Brief at 22. The argument is moot in light of the fact that, as demonstrated by the final denial letter and Dr. Lewis's report, Defendants obtained additional evidence and considered all of Plaintiff's evidence when deciding the appeal.

### Even if De Novo Review were to Apply, the Court would Still Uphold the Denial of Benefits

    Even if the more stringent de novo standard of review were to apply in this case, the court would still affirm the decision of Defendants to deny benefits. This is because, as demonstrated earlier, the manner in which Neathery operated his vehicle is strongly suggestive that Neathery died from a medical event. Pacaldo observed Neathery leaving the road at 10 miles per hour, and Plaintiff's accident reconstructionist estimates that Neathery was driving at 17 to 25 miles per hour upon impact with the oil pump. This evidence establishes that Neathery was accelerating as he approached the oil pump, which is inconsistent with Plaintiff's theory that Neathery was attempting a drive-by inspection of the oil pump. A reasonable person would have slowed down, not sped up, as he approached the target of his inspection. Furthermore, Feiereisen's opinion that Neathery misjudged the distance to the oil pump due to poor contrast between the ground and the base of the pump is not credible given that Feiereisen was relying on a photograph of the scene and not personal observation of the scene itself.

    In addition, Pacaldo, who immediately pulled over to view Neathery inside the truck shortly after the crash, found Neathery unresponsive, with his eyes and mouth open, carrying a frozen facial expression, and immobile with the exception of what appeared to be involuntary twitching of the arms. Pacaldo noticed no sign of injury,

such as the presence of blood or bruising on Neathery's body, and this was confirmed in the autopsy report. In sum, the evidence establishes that it is more likely than not that Neathery had already suffered a medical event, which lead or contributed to his death, before his truck drifted off the road.

## CONCLUSION

Of the innumerable sufferings life doles out to human beings, the loss of a beloved spouse amid unanswered questions is undoubtedly among those which pain the mind and soul most deeply. The court is mindful of how such a loss continues in an unrelenting way when it becomes unavoidably interwoven with matters of the law. The court is nevertheless bound to arrive at the correct legal result in light of applicable standards and the evidence before it. Accordingly, the court finds that the administrative record provides a reasonable and factual basis for Defendants' denial of benefits and therefore its decision was not an abuse of discretion. Although reasonable people could arrive at different conclusions as to the cause of death in this case, the law only requires Defendants to have acted reasonably. Therefore, the decision to deny benefits on the basis that Mr. Neathery's death was not the result of an accident covered by the relevant policies is affirmed. The clerk is directed to enter judgment in favor of Defendants.

**IT IS SO ORDERED.**

DATED: 7/31, 2007

JEFFREY T. MILLER
United States District Judge

cc: all parties